UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MATTHEW SZAPPAN,

    Plaintiff,

v.

TROY MEDER, et al,

    Defendants.

_____/

Case No. 18-cv-12244

Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

## ORDER GRANTING IN PART DEFENDANT MEDER'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

On July 17, 2018, Plaintiff Matthew Szappan filed a complaint against Defendants Troy Meder, trooper for the Michigan State Police, Mark Garabelli, Sergeant for the Saginaw County Sherrif's Department, "Deputy Shields," Deputy for the Saginaw County Sherriff's Department, and Saginaw County. ECF No. 1. Plaintiff is a resident of Chesaning, MI, where he resides with his wife and children.[1] Plaintiff alleges that the defendant police officers violated his rights during a child welfare check at his residence. The officers conducted a warrantless search of his barn, discovered methamphetamine ingredients, investigated further, and then referred the matter for prosecution.

The complaint asserts three counts under the fourth amendment against Defendants Meder, Garabelli, and Shields including: unlawful search and seizure (Count I), unlawful arrest (Count II), and malicious prosecution (Count III). The complaint also asserts a *Monell* claim for violation of the fourth amendment against Defendant Saginaw County (Count IV). Finally, the complaint asserts two state law claims against Defendants Meder, Garabelli, and Shields: invasion of privacy (Count V), and intentional infliction of emotional distress (IIED) (Count VI).

---

[1] The record does not appear to contain information about the children, such as the number of children or their ages.

On October 12, 2018, Officer Meder filed a motion to dismiss or in the alternative for summary judgment. ECF No. 6. No other defendants filed a motion. Thus, only the claims against Officer Meder are relevant to this motion, which excludes Count IV (the *Monell* claim). On November 20, 2018, Plaintiff filed a response to the motion. ECF No. 12. Officer Meder replied on November 30, 2018. ECF No. 13.

**I**.

The allegations in the complaint, which are presumed true in addressing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[2], are as follows. On or about July 18, 2015, personnel from the Michigan Department of Health and Human Services, Child Protective Services ("CPS"), "received information[3] regarding possible drug use or manufacture at Plaintiff's residence located at 13100 S. Graham Road in Chesaning, Michigan." Compl. ¶ 8. Acting upon the information they received, CPS personnel decided to check on the welfare of Plaintiff's children at Plaintiff's residence. *Id.* ¶ 9. CPS personnel contacted the Saginaw County Sheriff Department and requested that personnel from the Saginaw County Sheriff Department accompany the CPS personnel to the residence while they performed their welfare check. *Id.* ¶ 10. In response to this request, at approximately 1:30 PM, Sergeant Garabelli and Deputy Shields were dispatched to the residence to assist the CPS workers to perform their welfare check. *Id.* ¶ 11.

Officer Meder overheard the dispatch, contacted Sergeant Garabelli, offered his assistance, and then proceeded to the residence to assist Sergeant Garabelli and Deputy Shields. *Id.* ¶ 12. Officer Meder met with the CPS worker north of the residence. *Id.* ¶ 13. Shortly thereafter, Sergeant Garabelli and Deputy Shields arrived and met with Officer Meder and the

---

[2] *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)
[3] The parties have not provided any explanation concerning the nature or source of this information.

CPS worker. *Id.* ¶ 14. Officer Meder briefed Sergeant Garabelli and Deputy Shields regarding what he had learned from the CPS worker, and the foursome proceeded to the residence located just south of where they had met. *Id.* ¶ 15.

Upon arriving at the residence, the foursome discovered the home surrounded by a fence with an unlocked gate across the driveway. *Id.* ¶ 16. They parked on the road and yelled at the house until someone came out to meet with them. *Id.* A short time later, Plaintiff's wife exited the residence and met the foursome by the driveway gate. *Id.* ¶ 17. The CPS worker explained the purpose of their presence at the property, and the female opened the gate and allowed them entry onto the property. *Id.* ¶ 19. Officer Meder observed a barn on the rear part of the property behind the residence. *Id.* ¶ 20. The barn door was open and lights were on inside. *Id.* Without obtaining consent, Officer Meder and Deputy Shields proceeded to the barn in search of Plaintiff. *Id.* ¶ 21.

Officer Meder and Deputy Shields began their search for Plaintiff without looking for Plaintiff's children. *Id.* ¶ 22. When Officer Meder and Deputy Shields entered the backyard of the residence, Officer Meder observed marijuana plants in the backyard. *Id.* ¶ 23. Officer Meder and Deputy Shields proceeded to the barn and entered a workshop on the south side of the barn. *Id.* ¶ 24. During the search of the barn, Officer Meder discovered a one-pound container of table salt located on a table near a work bench. *Id.* ¶ 29. Officer Meder further discovered a one-gallon container of acetone on a table, a one-gallon container of Coleman camp fuel, a one-quart size container of Coleman camp fuel, and a container of Lye. *Id.* ¶ 30. Although Officer Meder did not observe any methamphetamine being manufactured, he nonetheless concluded that these items could be used to manufacture methamphetamine, and at least two of the items had no logical use in a workshop with no plumbing, not even for storage purposes. *Id.* ¶ 31. Only after

they conducted their search of the barn did Officer Meder and Deputy Shields proceed back to the residence where they met the CPS worker and Sergeant Garabelli speaking with Plaintiff and his wife. *Id.* ¶ 32.

Officer Meder then contacted a Saginaw County Assistant Prosecuting Attorney who advised Officer Meder that the evidence he discovered during his warrantless search of the barn could be used in support of a search warrant to search the remainder of the property. *Id.* ¶ 33. The Saginaw County Assistant Prosecuting Attorney agreed to meet with Officer Meder and to draft an Affidavit and Search Warrant for the premises. *Id.* ¶ 34.

Officer Meder and Sergeant Garabelli decided that Plaintiff and his wife should leave the premises pending the execution of the Search Warrant. *Id.* ¶ 35. Sergeant Garabelli and Deputy Shields then began escorting Plaintiff and his wife to a parked car in the driveway. *Id.* ¶ 36. Officer Meder instructed Sergeant Garabelli and Deputy Shields to conduct a warrantless search of the vehicle before allowing Plaintiff and his wife to remove it from the premises. *Id.* ¶ 37. Plaintiff disclosed that his wife's shotgun was present in the vehicle. *Id.* ¶ 38. Officer Meder then searched the vehicle and seized the shotgun. *Id.* ¶ 39.

The District Court Judge issued a search warrant. *Id.* ¶ 43. BAYANET and the Third District Methamphetamine Response Team then searched Plaintiff's property, including the home, the curtilage, and all vehicles and outbuildings. *Id.* ¶ 44. Nine suspected marijuana plants and a 12-gauge Mossberg pump shotgun were seized. *Id.* ¶ 46. Plaintiff was arrested and subsequently charged with multiple felony counts. *Id.* ¶ 47-53. The Saginaw County Circuit Court ultimately granted Mr. Szappan's motion to suppress and "ordered that the evidence obtained by Defendants as well as the poisonous fruits of that evidence be suppressed." *Id.* ¶ 55.

The Saginaw County Prosecuting Attorney filed a Motion for an Order of *Nolle Prosequi* due to "lack of evidence," which the court entered. *Id.* ¶ 56-57.

## II.

### A.

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert*, 517 F.3d at 439. The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

### B.

A motion for summary judgment is fundamentally different than a motion to dismiss and should be granted only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

### A.

Defendant's argument in response to Count I addresses the allegations in the complaint but treats some of them as undisputed facts. Defendant then proffers inferences from those facts, *as well as facts in the evidentiary record* (facts which he contends "round out the picture") and argues that those facts entitle him to summary judgment. Defendant's arguments in response to Count II and III (unlawful arrest, malicious prosecution) are derivative of his argument in response to Count I, as he argues that his qualified immunity defense is equally applicable to Counts II and III as it is to Count I.

A court generally cannot look beyond the face of the Plaintiff's complaint when adjudicating a motion to dismiss for failure to state a claim unless the court converts the motion into a motion for summary judgment. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). Because the arguments for dismissal of Counts I-III address the sufficiency of the evidence as a whole (including undisputed allegations as well as documentary evidence), Counts I-III will be addressed using the summary judgment standard.

**i.**

Defendant seeks dismissal of Count I based on qualified immunity. Although the Saginaw County Circuit Judge presiding over the criminal case held that the search of the barn was unlawful, that fact alone does not necessarily give rise to a civil claim for damages. Rather, the doctrine of qualified immunity provides that "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Anderson*, the Supreme Court explained the right must have been "clearly established" in a "particularized" sense and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

> The Fourth Amendment provides:
>
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. In order to satisfy the fourth amendment's reasonableness requirement, a non-consensual search generally requires a warrant, absent certain limited and well-defined exceptions. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Coolidge v. New Hampshire*, 403 U.S. 443, 443–44 (1971).

First, Defendant contends that he had consent to enter the backyard and the barn. "Consent must be proved by clear and positive testimony and must be unequivocally, specifically, and intelligently given . . ." *U.S. v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992). "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "The standard for measuring the scope of a suspect's consent ... is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Defendant argues as follows:

> There is no dispute that Mrs. Szappan was informed of the purpose of the visit . . . there is no dispute that Mrs. Szappan opened the gate and permitted all four individuals to enter the property for the purpose of a child welfare check. There is also no dispute that she lived there and had actual and apparent authority to give that consent. *The scope of that consent would include attempts to locate and contact her husband. Like going to the front door of a residence, entering a "wide open" barn door that is lit inside is a customary allowance given to visitors trying to locate whoever might be in or near the barn.*

Mot. at 14-15 (emphasis added).

The only objective facts Defendant identifies are 1) that Mrs. Szappan was informed of the purpose of the visit (a child welfare check) and 2) that she opened the gate in front of the driveway to permit the four individuals to enter. Defendant does not explain how a reasonable officer would interpret this to be an invitation to search the entire property for her husband, wherever he might be. Nor does Defendant support his contention that "a wide-open barn door that is lit inside is a customary allowance given to visitors trying to locate whoever might be in or near the barn." Indeed, existing precedent cuts the opposite way. *See*, *e.g., Fla. v. Jardines*, 569 U.S. 1, 19 (2013) ("A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway. A visitor cannot traipse through the garden, *meander into the backyard*, or take other circuitous detours that veer from the pathway that a visitor would

customarily use.") (emphasis added) (Alito, J, dissenting) (citing *United States v. Wells,* 648 F.3d 671, 679–680 (8th Cir. 2011) (police exceeded scope of their implied invitation when they bypassed the front door and proceeded directly to the back yard).

Next, Defendant argues that his entry into the backyard and barn was justified as a protective sweep. The protective sweep doctrine arises out of *Maryland v. Buie*. It is an exception to the warrant requirement which justifies a limited search of a residence in conjunction with a lawful arrest. To perform a protective sweep, an officer must possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those *on the arrest scene*." *Maryland v. Buie*, 494 U.S. 325, 337 (1990) (emphasis added). It is not, however, a full search, and "extend[s] only to a cursory inspection of those spaces where a person may be found" and lasts "no longer than it takes to complete the arrest and depart from the premises." *Id.* at 326.

Notably, all three cases cited by Defendant to support his application of the protective sweep doctrine involved an arrest inside the suspect's home and a limited search of the home in conjunction with that arrest. Mot. at 14 (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007); *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996)). Here, by contrast, Defendant was not at the residence to perform an arrest, nor did the investigating officers have any individualized suspicion that Mr. Szappan was engaged in criminal activity. Rather, the sole purpose of the visit to the Szappan residence was a child welfare check.

Defendant's unstated assumption is that the protective sweep doctrine applies where an officer is carrying out any investigative duty, such as a child welfare check, and believes he or she has a legitimate safety concern. Defendant offers no support for his broad interpretation of

the protective sweep doctrine. This expansion of the protective sweep doctrine would essentially swallow the special protections afforded to homes and the curtilage surrounding those homes. "[T]he most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se unreasonable* under the Fourth Amendment—subject only to a few *specifically established and well delineated exceptions*. The exceptions are jealously and carefully drawn." *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971) (emphasis added).

Even if the protective sweep doctrine was applicable in this context, the sweep must still satisfy the test set forth in *Maryland v. Buie*, which requires "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). Officer Meder provided the follow testimony before the state court at the preliminary examination regarding his interest in the barn:

> I was made aware by Sergeant Garabelli prior to arriving there that they had, the sheriff's department had been out there, Sergeant Garabelli himself, in the not too distant past reference Mr. Szappan claiming that there were people in the corn watching his home and he was threat – he felt threatened and I believe there were people with guns in the cornfield behind his house. So I was concerned that, I didn't want to be confused for a threat to Mr. Szappan, and at that point we had not yet seen Mr. Szappan . . . Based on what – if I can be quite frank when Sergeant Garabelli had told me and related to me and this is a cop time kind of conversation that we understand what we're talking about, Mr. Szappan had been using a lot of drugs and may or may not be losing his mind. And there was some concern that he might take just about anything as a threat to his wellbeing and I didn't want to be that target . . . I guess to be more clear they did go out there, the sheriff's department, Sergeant Garabelli included and there is no evidence of anyone being around his home. It was almost a lapse of paranoia.

Hrg. Tr. at 8, 30, ECF No. 6-2. Mrs. Szappan's affidavit provides some additional context regarding the police report concerning the "men in the corn watching his home:"

> During the summer of 2015, I contacted 9-1-1 and reported that my former boyfriend and a second unidentified male were standing in a cornfield across the street from my home pointing guns at my husband and I and at our home. This incident occurred because my former boyfriend was angry regarding his parenting time with our child in common. In response to my 9-1-1 call, Saginaw County Sherriff's Deputy Mark Garabelli arrived at the scene to investigate the matter . . . Instead of investigating the matter, Officer Garabelli laughed about the report and claimed that my husband, Matthew Szappan, was "hallucinating" and that I was going along with my husband's false story.

Megan Szappan Aff. ¶ 3, 4, 5, 8.

It is not entirely clear what details Sergeant Garabelli shared with Officer Meder prior to his search of the barn. Rather, Officer Meder offers only a vague explanation that he and Sergeant Garabelli had "a cop time kind of conversation that we understand what we're talking about." Based on this "cop time kind of conversation," Officer Meder was informed that Mr. Szappan had perhaps made an unfounded police report concerning men with guns in his cornfield and that Mr. Szappan was a drug user. Based on this information, Officer Meder concluded that Mr. Szappan would take anything as a threat to his well-being.

Officer Meder has not established a reasonable fear based on specific and articulable facts that Mr. Szappan was in the barn and also dangerous. The details concerning Mrs. Szappan's false police report are sparse and vague, as are the details concerning Mr. Szappan's alleged drug use. The previous police report concerning "men in the cornfield with guns" had already been fully investigated by the Sherriff's office, apparently without incident. Moreover, at no time did Officer Meder attempt to locate Mr. Szappan in the residence.

As it turns out, Mr. Szappan was in fact located in the residence, and Sergeant Garabelli had already made contact with Mr. Szappan while Mr. Szappan was on the front porch eating a half gallon of ice cream. Garabelli Testimony, pp. 6-7, 9-11, ECF No. 12-4. Officer Meder had not yet arrived at the scene, however. *Id.* Officer Meder contends that at the time of his arrival,

Mr. Szappan was not visible and that he (Officer Meder) was not privy to any communication between Officer Garabelli and the Szappans. Meder Testimony p. 42, ECF No. 12-6.

Notably, the facts allegedly giving rise to Officer Meder's safety concern (namely Mr. Szappan's drug induced paranoia) were obtained during Officer Meder's "cop time kind of conversation" with Officer Garabelli. Thus, it seems unlikely that Officer Meder was unable to obtain from Officer Garabelli the very information that would have dispelled his safety concern and resolved his uncertainty about Mr. Szappan's location. Rather than approaching the residence or conferring with Officer Garabelli about Mr. Szappan's whereabouts, Officer Meder proceeded to the barn. By doing so, he effectively shielded himself from the information that would obviated his alleged need to search the barn.

Lastly, Defendant appeals to the "plain view doctrine" in passing, contending that "the case paints a picture of an officer who happens upon items in plain view in a barn that added up to probable cause to find out whether Szappan was operating an illegal methamphetamine laboratory." Mot. at 13. Officers may properly seize evidence of crime without a warrant if that evidence is (1) "in plain view," (2) "its incriminating character [is] 'immediately apparent,'" (3) "*the officer [is] lawfully located in a place from which the object can be plainly seen*," and (4) the officer "must also have a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136–37 (1990) (emphasis added). Defendant's argument presupposes that he was lawfully present in the barn in the first place. As discussed above, he was not lawfully present in the barn. Therefore, the plain view doctrine does not apply.

In sum, Defendant has not established his entitlement to qualified immunity, as he has not established facts that would enable a reasonable officer to conclude that the search of the barn was lawful. He has not established facts indicating that Mrs. Szappan consented to the search.

There is no customary societal norm that allows visitors to investigate structures adjacent to the residence just because the door is open and the light is on. Defendant has identified no authority suggesting that the protective sweep doctrine has any applicability outside the context of a home arrest. Moreover, even if the protective sweep doctrine was applicable, the facts offered to justify the search here fall well short of the standard set forth in *Marlyand v. Buie* governing protective sweeps. Finally, the plain view doctrine does not justify the seizure of the methamphetamine ingredients because Officer Meder was not lawfully present in the barn when he observed the items in plain view. Accordingly, Defendant's motion will be denied as to Count I.

**ii.**

Defendant also seeks dismissal of Counts II and III (unlawful arrest and malicious prosecution), based on qualified immunity. In light of the evidence seized from the barn (albeit unlawfully), Plaintiff does not and cannot dispute that the subsequent warrant, arrest, and prosecution was supported by probable cause. Plaintiff does not contest that the ingredients found in the barn were identifiable by an officer as meth-cooking ingredients, furnishing probable cause to support the search warrant application. The search warrant was then issued and executed, yielding marijuana plants and a shotgun. This evidence then furnished probable cause to support the criminal prosecution.

Where the parties disagree is on the extent to which the initial fourth amendment violation (the search of the barn) infects all subsequent actions taken in reliance on the seized methamphetamine ingredients. Plaintiff relies almost exclusively on precedent regarding the inadmissibility of evidence obtained as a result of a constitutional violation. Resp. at 16 (citing *Wong Sun v. United States*, 371 US 471, 487-485 (1962) (articulating the "fruit of the poisonous tree" doctrine); *Alderman v. U.S.*, 394 U.S. 165, 177 (1969) ("[n]othing seen or found on the

premises may legally form the basis for an arrest or search warrant or for testimony at the homeowner's trial, since the prosecution would be using the fruits of a Fourth Amendment violation."). These statements of law quoted in Plaintiff's brief are undeniably true. Indeed, the state court suppressed the evidence obtained via the search warrant, as it was infected by the initial constitutional violation.

However, this does not answer the question to be addressed here. Plaintiff contends that "the issue now before this Court is whether probable cause to arrest Plaintiff existed *absent reliance upon the unlawfully seized evidence*." Resp. at 18 (emphasis in original). Not so. The question at issue is whether the evidence supports a finding that Officer Meder violated Plaintiff's clearly established constitutional rights. With respect to the initial search of the barn, this question was answered in the affirmative. Plaintiff assumes, without support, that the fruit of the poisonous tree doctrine applies equally in the context of a civil claim for damages.

Plaintiff contends that all subsequent law enforcement actions which trace their roots back to the initial search also amount to violations of clearly established rights. The closest Plaintiff comes to supporting this proposition is Plaintiff's citation to *Owens v. Carpenay*, 939 F. Supp. 558 (E.D. Mich. 1996). In *Owens*, the court explained as follows:

> *It seems to follow* that a judicial determination of probable cause cannot shield Defendants from liability for malicious prosecution if that determination depended upon statements that should have been suppressed. *Neither the parties nor this Court, however, have identified any case law squarely addressing this issue. In any event, having determined that Plaintiff's allegation of false testimony is alone sufficient to defeat the preclusive effect of Judge Svenson's determination of probable cause, the Court need not resolve this difficult question.*

*Id.* (emphasis added). Notably, Plaintiff omitted the italicized portion of this quote from his brief. Rather, he selectively quoted only the unitalicized portion, creating the erroneous impression that it was an express holding of the case. Not so. Rather, the court noted that the question at issue is

a difficult one which was not squarely addressed by the relevant case law. Ultimately, the court did not resolve the question.

In sum, Plaintiff identifies no violation of his constitutional rights independent from the initial search of the barn. This violation is the predicate he uses to support his claims for unlawful arrest and malicious prosecution, actions which he concedes were otherwise supported by probable cause *but for the unlawful search*. Plaintiff attempts to use the "fruit of the poisonous tree" doctrine as a sword to pierce qualified immunity and support a claim for civil damages as to all law enforcement actions taken in reliance on the tainted evidence. Because Plaintiff offers no legal support for this use of the "fruit of the poisonous tree" doctrine, his claims are without merit. Accordingly, Defendant's motion will be granted as to Counts II and III.

**B.**

Because the allegations in the complaint are insufficient to support Counts V and VI (invasion of privacy and IIED) without regard to any documentary evidence identified by the parties, the claims will be dismissed pursuant to rule 12(b)(6).

**i.**

Defendant seeks dismissal of Count V (invasion of privacy), arguing that Plaintiff has failed to state a claim. "Invasion of privacy" is not a specific common law tort in Michigan. Rather, Michigan recognizes four distinct types of privacy torts: 1) intrusion upon seclusion, 2) public disclosure of embarrassing private facts, 3) publicly painting the plaintiff in a false light, and 4) appropriation of the plaintiff's likeness. *Beaumont v. Brown*, 401 Mich. 80, 108 (1977), overruled on other grounds, *Bradley v. Saranac Cmty. Sch. Bd. of Educ.*, 455 Mich. 285 (1997).

Plaintiff's specific allegations shed some light on which of these torts he is alleging Officer Meder committed. Plaintiff alleges as follows: 1) "Plaintiff had a matter that was private to him," 2) "Plaintiff had the right to keep the matter private," and 3) "Defendants invaded Plaintiff's privacy by obtaining information about the matter by a method that would be objectionable to a reasonable person." Compl. ¶¶ 76-78. Defendant interprets these allegations as asserting a claim for "intrusion upon seclusion," and Plaintiff does not dispute this interpretation. Under Michigan law, Plaintiff must satisfy the following elements to establish intrusion upon seclusion: (1) the existence of a secret and private subject matter, (2) a right possessed by the plaintiff to keep that subject matter private, and (3) the obtaining of information about that subject matter through some method objectionable to a reasonable man. *Lewis v. LeGrow*, 670 N.W.2d 675, 687 (Mich. App. 2003).

Defendant argues that Plaintiff does not have a privacy interest in his operation of a meth lab (a sensible argument). Plaintiff responds with a lengthy analysis of governmental immunity. Plaintiff does not, however, address the sufficiency of his allegations to establish the three elements of intrusion upon seclusion. Accordingly, Count V will be dismissed.

**ii.**

Finally, Defendant seeks dismissal of Count VI (IIED). To establish such a claim, Plaintiff must demonstrate (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Roberts v. Auto Owners Ins. Co.*, 422 Mich. 594 (1985); *Hayley v. Allstate Ins. Co.*, 686 NW2d 273 (2004). The conduct must be so outrageous as to exceed all possible bounds of decency and be regarded as atrocious and utterly intolerable for society. *Roberts*, 422 Mich. At 603.

Plaintiff alleges as follows: 1) "Defendants have engaged in extreme and outrageous conduct, 2) "Defendants engaged in said conduct intentionally or recklessly, and 3) "Defendants conduct caused Plaintiff harm in the form of severe emotional distress." "A formulaic recitation of the elements of a cause of action" is insufficient to survive a 12(b)(6) motion. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff does nothing to bridge the gap between the allegations concerning the police conduct and his conclusion that the conduct qualifies as IIED. Plaintiff's response brief focuses largely on governmental immunity but engages in no discussion of the substantive elements of IIED and how the facts of this case satisfy such a claim. Officer Meder walked into Plaintiff's barn during a child welfare check. Although this action was a constitutional violation, it did not exceed all bounds of common decency nor was it so atrocious as to be utterly intolerable in a civilized society. *See Roberts*, 422 Mich. At 603. Accordingly, Count VI will be dismissed.

**IV.**

Accordingly, it is **ORDERED** that Officer Meder's "motion to dismiss or in the alternative for summary judgment," ECF No. 6, is **GRANTED IN PART** as set forth above.

It is further **ORDERED** that Counts II, III, V, and VI of the complaint, ECF No 1. are **DISSMISSED** as to Officer Meder.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 4, 2019